The plaintiff, Hugh Lamb, a man of weak intellect, illiterate and easily imposed on by one in whom he had confidence, had become much dissatisfied with the conduct of his wife, who had given birth to a colored child, left his domicile and went to live with his brother, the defendant, Isaac Lamb, taking with him his two daughters, Rebecca Ann and Julia Maria, who were infants, his only children, where he resided for about five years. About the time of his removing to the house of his brother he made an absolute conveyance of the tract of land he had been living on, also of his slaves, six in number, and some other property. These conveyances are admitted by Isaac to have been without consideration, and he says that they were made to exclude his wife from any participation in the plaintiff's property. The plaintiff in his bill alleges that these conveyances were upon certain trusts entered into and agreed on between the two brothers, viz., that Isaac should maintain his brother and two daughters during his (plaintiff's) life, and after his death should convey the property to the two daughters in equal shares. That these trusts were not inserted in the conveyance or at all expressed in writing, because he was ignorant and believed that they could be enforced without being so expressed.
In 1829, after having lived with his brother Isaac some four or five years, the plaintiff removed with his two daughters to the house of the defendant Pigford, who had married his sister; about the same time the conveyances which the plaintiff had made of his land and negroes (197) to his brother Isaac were surrendered to him and canceled (never having been registered), and conveyances were made at the same *Page 137 
time to the defendant Pigford of the property which he had conveyed to his brother Isaac, to wit, a tract of land of 350 acres and eight slaves (naming them). The consideration for the land as expressed in the deed was $350, and for the slaves $1,500. The plaintiff and his daughters continued to reside with the defendant Pigford from 1829 until 1838, when Rebecca Ann married one John Watkins; the defendant Pigford at this time conveyed to her one of the negroes which her father had conveyed to him, and three others, the children of another woman, who had been thus conveyed. The plaintiff and his daughter Julia still continued their residence with Pigford until the year 1844, when Julia intermarried with one Josiah Johnson, and on 13 October in that year the defendant Pigford settled by deed four slaves upon the said Julia and her children, which slaves were of the negroes conveyed by the plaintiff to him and their increase. Shortly after the marriage of his daughter Julia the plaintiff left the house of Pigford and resided with one or the other of his sons-in-law.
The bill alleges that these conveyances for the land and slaves to Edward Pigford were wholly without any consideration paid or secured by him, but were made in trust and confidence that the said Pigford would maintain and support the plaintiff at his house during his (plaintiff's) life; also support and educate his two daughters, until their marriage. On their marriage the slaves were to be equally divided between them, excepting four (which were named), and on the death of the plaintiff, these four with the land were to be conveyed, by the said defendant to the said two daughters, or in case of their death, to their next of kin; that the rents of the land and the services of the slaves were to be received by the defendant as a compensation for maintaining the plaintiff and his two daughters, and for educating the latter. The bill further alleges that this trust was not put in writing, for that the (198) plaintiff was ignorant and illiterate, and was deceived and misinformed by his brother-in-law, the defendant Pigford, in whom he had confidence, who advised and persuaded him to the course pursued and that he verily believed these trusts were as valid as if they had been incorporated and set forth in the conveyances themselves. The plaintiff in his bill further alleges that the defendant has complied with the trust undertaken by him, so far as to give the slaves above mentioned to the two daughters upon their several marriages, but that he refuses to execute the same any further and denies that any such trust exists. That he has sold the tract of land to the other defendant Isaac, who had full notice of the plaintiff's equity.
The prayer is for a reconveyance of the land and slaves, and an account of the rents of the land and hires of the slaves and for general relief. *Page 138 
The defendant Pigford in his answer denies that there was any trust in his dealing for the land and slaves in question. He alleges that this transaction was fair, and well understood by the plaintiff, and that the sale was intended to be absolute; that the considerations expressed in the deeds were about the value of the property purchased by him, and that the same was duly paid. He says that he paid sixty dollars of the money down, and gave his note for the residue of the purchase-money, which he has long since paid off, and that the plaintiff owes him for board for himself and daughters, and for money lent, and for personal services and articles furnished to the amount of $1,500 or more. He denies that the plaintiff is a man of weak intellect; denies that he used any persuasion or any means to deceive the plaintiff, and insists upon the length of time as a bar to the plaintiff's claim; also upon the statute requiring contracts of this kind to be in writing. As to the conveyances of the negroes to the daughters on their respective marriages, he (199) says that he did not make the same out of any sense of trust, duty or obligation, but was therein moved entirely by benevolence andaffection for the plaintiff and his family.
Isaac Lamb in his answer admits that he bought the land from the defendant Pigford at $450, but denies that he had any notice of the plaintiff's equity.
Replication to defendant's answer, commissions and depositions filed in the cause (the substance of which is set forth in the opinion of the Court). Upon these, with the exhibits and former orders, the cause was set down for hearing, and sent to this Court by consent.
This case adds one more to the many which have recently been before the Court, in which the plaintiff has sought by parol proof to convert a deed absolute on its face into a trust or security for money, upon the allegation that the clause of the declaration of trust or redemption was omitted by reason of ignorance, mistake, fraud or undue advantage. The principles upon which relief is given, and the kind and amount of testimony which is required in such cases, are attempted to be fully set forth and explained in Clement v. Clement, ante, 111, and need not be again repeated. Before proceeding to the enquiry whether the plaintiff has supported his allegations by the necessary proof, it is proper that we should dispose of the objection urged by the defendants against the bill for the want of parties. It is contended that as a part of the trust (which the plaintiff charges was intended to have been inserted in the deeds to the defendant Pigford and omitted by means *Page 139 
of his fraudulent contrivance) was for the two daughters of the plaintiff, they and their husbands ought to have been made parties, and that the bill cannot be sustained without them. (200)
The objection raises the question, whether the plaintiff's daughters have such an interest in the land and slaves, by reason of the trust which he intended to declare for them, as can give them any right in their father's lifetime to enforce it in equity? Our opinion is that they have not. It is a well-settled rule in equity that a contract will not be specifically enforced if it be not founded on a valuable consideration. Adams Eq., 78; Woodall v. Prevatt, 45 N.C. 199. Here was no contract between the defendant and the plaintiff's daughters, and no consideration moving between them. As between the daughters and their father, there was indeed a meritorious consideration, but as his intended bounty to them was imperfectly executed, it could not be enforced against him in his lifetime, though it might be, if his intention remained unaltered at his death, against any person claiming by operation of law without an equally meritorious claim. Adams Eq., 97; Garner v. Garner, 45 N.C. 1. The father's title to the land and slaves conveyed to the defendant, so far as his daughters are concerned, remained, therefore, unaffected by his intended disposition of them in their favor, and he alone is entitled to call upon the defendant to execute the alleged trust. The daughters and their husbands have no direct and certain interest in the subject matter of the suit, nor indeed, any other interest, except the possibility of succeeding to the estate of the father as his heirs at law and next of kin, and of course they would be improper parties to the suit. If this view of the case be correct, and we think it is, it disposes also of the objection to the competency of these persons as witnesses for the plaintiff. It is not pretended but that children may be witnesses for their father, though they may ultimately be benefited by the decision of the suit in his favor. Their relation to him may affect their credibility, but not their competency.
We are prepared now to enter upon the examination of the testimony taken upon the issues made by the pleadings. The (201) main issue, and that upon which the case must principally turn, is whether the deeds executed by the plaintiff to the defendant Pigford were intended to be what they purport on their face, absolute deeds conveying, for a full and fair price paid to the plaintiff, the land and slaves therein mentioned to the said defendant for his own use, unaffected by the trusts set forth in the bill. The burden of proof is on the plaintiff, and we have seen that he must show, not merely declarations of the defendant acknowledging the trusts, but facts and circumstances, dehorsthe deed, inconsistent with the idea of an absolute purchase for himself. Before looking to the plaintiff's proofs, it is proper to remark that the *Page 140 
statements of the answer in relation to the payment of the purchase money are not so full, explicit and circumstantial as the case required. They deal so much in generalities as to give that part of the answer the character of evasiveness, and thereby to induce a suspicion of its candor and truthfulness. But if it were otherwise, the plaintiff's testimony has fairly met and completely overthrown it. That the plaintiff was an illiterate, simple-minded man, and one easily imposed upon by those in whom he had confidence, is clearly proved by many witnesses. That the defendant Pigford held the land and slaves mentioned in the deed, in some way for the use and benefit of the plaintiff and his daughters, he more than once acknowledged to John Watkins and others. But throwing this testimony aside, and counting for nothing, too, the long period during which the defendant permitted the plaintiff and his infant daughters to live at his house and furnished them with board and other necessaries, all of which was in accordance with the alleged trust, we have abundant proof from the acts of the defendant to show that he did not hold the property absolutely as his own, but upon the trusts alleged by the plaintiff. Upon the marriage of the daughters he gave to each of them four of the slaves and their increase, which he had (202) obtained from the plaintiff. This is admitted by the defendant; but he alleges that they were mere gifts — pure gratuities induced by no legal, moral or any other consideration than good will and benevolence toward the parties, who were nieces of his wife and inmates of his family. That may be so, but it is so contrary to our experience of the ordinary course of human conduct that we hesitate to believe it, unless we find it corroborated by something more than the defendant's assertions. Do we find any such corroborative testimony? Not so; on the contrary, we find a circumstance connected with the execution of the deed of gift for the four slaves from the defendant Pigford to the wife of John Watkins, deposed to by the said Watkins and John Gideons, which is consistent enough with the idea of a transaction founded upon a valuable consideration or the performance of a duty, totally at variance with that of a gift or voluntary bounty. The circumstance is thus stated by Gideons, who was one of the subscribing witnesses:
"I was present and witnessed such with Hugh Sharpless. Mr. Pigford presented a receipt to Mr. Watkins to sign, which Watkins refused to sign. Pigford then asked him what he would do, and he said he would sign a receipt that he had received these four negroes. Mr. Pigford told him to sign that receipt, and not to come back there after any more property. Mr. Watkins then signed it. This was the second receipt as prepared."
The account of the transaction given by Watkins himself is much more full and circumstantial, stating, among other things, that the *Page 141 
receipt which he refused to sign expressed that his wife "should never expect to receive any more of Hugh Lamb's property." The enquiry occurs at once to every mind, why, if the gift of the slaves was free and voluntary, take a receipt at all? Why permit the donee to higgle about the receipt? Surely the records of benevolence might be searched in vain for such another instance of impertinence on the part of a donee, and forbearance on that of the donor! Strange as this conduct of the defendant Pigford may appear, we might perhaps believe (203) it were it consistent with other parts of his conduct as deposed to by some of the other witnesses, whose character is stated by his own witness, John D. Powers, to be good. When the plaintiff, or his agent for that purpose, Thomas H. Tate, demanded the property in question of the defendant, he was rude, and according to the statement of Edward Pittman, vulgar and insulting. He denied the right of the plaintiff, and then insisted that the plaintiff owed him an account of $1,500 according to one witness and $2,500 according to another, and yet, though requested to do so, he never produced any account nor proves any part of it, nor indeed the payment of the purchase-money for the land and slaves, except by his son James B. Pigford. And the credibility of this witness, though his character is proved to be good, is much impaired by the fact that a part of his testimony, to wit, that relating to the demand, is directly contradicted by the testimony of four others whose character is also proved to be good. Without adverting to every minute circumstance appearing in the proofs, we feel ourselves bound to declare that the transfers of the eight slaves to the daughters of the plaintiff upon their respective marriages, and the circumstances which attended them, particularly that made to Mrs. Watkins, are not shown by the defendant Pigford to have been pure gifts, and are therefore inconsistent with the idea that he purchased the slaves of the plaintiff at a full and fair price bona fide and absolutely for himself. We feel bound to declare further, that the trusts alleged by the plaintiff were assumed by the defendant Pigford, but were omitted in the deed by the fraud and imposition of the said defendant. The pretended purchase of the land was made at the same time and formed a part of the same transaction with that of the slaves, and was, in our opinion, agreed to be taken upon the same trusts. We are satisfied from the testimony of John Watkins, taken in connection with the fact that the defendant Isaac Lamb had taken similar conveyances from his brother, the plaintiff, upon similar trusts, that he very well knew the character of the deeds (204) from his brother to his codefendant and brother-in-law, Pigford. The plaintiff is entitled to a decree declaring that the defendants hold the property mentioned in the pleadings (except such of the slaves as have been conveyed to his daughters) in trust for the plaintiff, and also *Page 142 
that they shall account to him for the rent, hires and profits of such land and slaves. In taking the account the defendant will be allowed for all proper expenditures for the board, etc., of the plaintiff and his two daughters.
Cited: Glisson v. Hill, 55 N.C. 259.